LILLIAN  J.  WASHBURN  *vs.*  UNITED  STATES  CASUALTY  COMPANY.

Somerset.    Opinion November 20, 1911.

*Insurance.   Contract.   Renewal.   Premiums.   Credit.   Presumptions.   Application.
Warranties.    Estoppel.    Revised Statutes, chapter 49, section 93.*

A general insurance agent, pursuant to a long course of dealing with a decedent and under instructions "never to let a policy expire unless told to," received a renewal receipt from an accident insurance company and attached it to the decedent's policy, then in the agent's safe, charging the renewal premium to the decedent, crediting the amount to the company, and attaching copy of the receipt to the policy register. The decedent intended to have the policy renewed, and understood that it had been renewed. *Held*, that the policy was legally renewed.

Credit is presumed to have been extended to the insured for a premium, if the policy was delivered without requiring payment.

Under Revised Statutes, chapter 49, section 93, providing that insurance agents shall be regarded as in the place of their principals, an accident insurance company is bound by its general agent's act in writing and signing an application at an applicant's request, containing representations as to the applicant's occupation and habits.

On report.    Judgment for plaintiff.

Assumpsit on an accident insurance policy for $5000 issued to Henry Washburn, the husband of the plaintiff, and payable to the plaintiff as beneficiary in event of the death of the said Henry Washburn "resulting from bodily injury effected by external, violent and accidental means." This cause has previously been before the Law Court on exceptions. See *Washburn* v. *United States Casualty Company*, 106 Maine, 411. At the conclusion of the evidence in the second trial, the case was reported to the Law Court for determination.

The case is stated in the opinion.

*George W. Gower, and Turner Buswell*, for plaintiff.

*Merrill & Merrill*, for defendant.

SITTING: WHITEHOUSE, C. J., SAVAGE, SPEAR, CORNISH, BIRD, HALEY, JJ.

WHITEHOUSE, C. J.   This is a suit upon an accident insurance policy for $5000 issued to Henry Washburn, payable to the plaintiff as beneficiary in the event of the death of the insured "resulting from bodily injury effected by external, violent and accidental means." It is alleged that the insured came to his death on the 21st day of February, 1908, as the result of such a bodily injury sustained on the 19th of the same month and in this action the plaintiff seeks to recover the amount of the indemnity for the loss of life as stipulated in the policy.   The case has previously been before the Law Court on exceptions to the ruling of the presiding Justice ordering a nonsuit.   *Washburn* v. *Casualty Company*, 106 Maine, 411.   The exceptions were sustained and the case now comes to the Law Court a second time on a report of the evidence presented at the former trial, and certain additional testimony introduced at the second hearing.   Upon so much of this evidence as is legally admissible, the Law Court will now finally determine all questions of law and fact involved in the case.

It will be seen from an examination of the former opinion in this case in the 106th Maine, that the only question involved in the exceptions which was argued by counsel and considered by the court was whether the original policy which by its terms expired January 16, 1908, a month before the death of the insured, had been renewed according to the regulations and practice of the company, and the established course of business between its agent and the insured, so as to be legally in force at the time of the accident.   It was then the defendant's principal contention that its liability terminated with the expiration of the original policy.   But the opinion holds that the evidence then before the court was sufficient to warrant the conclusion that a valid contract of renewal had been made between the parties, and that the policy was in force at the time of the death of the insured.

A careful examination of the additional evidence now before the court, in connection with the former testimony, fails to disclose any

material fact tending in any degree to detract from or impair the
force and effect of the original evidence before the court on excep-
tions. On the contrary there is new and important evidence intro-
duced by the plaintiff which very materially strengthens the founda-
tion upon which the former opinion was based, that the original
policy had been legally renewed.

According to the former testimony, for ten or fifteen years prior
to the date of the policy in suit, Mr. Griffin, the general agent of
the company had been entrusted with the entire charge of Mr.
Washburn's insurance business, and kept all of his policies in his
safe in a pigeon hole devoted exclusively to that purpose. Mr.
Griffin stated that he had "explicit instructions" from Mr. Washburn
"never to let a policy expire unless he was told to," and that under
that instruction all of his policies had been renewed. It was con-
tended in behalf of the defendant, however, that this instruction
"never to let a policy expire" must be restricted in its application to
then existing contracts, and that it could not properly be extended
to include new contracts of insurance like the one in question, that
might afterward be made. It further appeared that about a month
before January 16, 1908, the date named for the expiration of the
original policy, according to the usual course of business, Mr.
Griffin received from the company a renewal receipt to continue the
policy in force another year. Before the expiration of the policy
Mr. Griffin duly countersigned this renewal receipt and attached it
to the policy then in Mr. Washburn's pigeon hole in the safe, and
January 16, 1908, charged the renewal premium of $25 to Wash-
burn and credited the amount to the company and also attached a
copy of it to his policy register. It was in evidence that Mr.
Washburn was never required by the agent to pay cash for a policy,
but paid the premium only on presentation of a bill therefor after
the policy had been deposited in the pigeon hole of the agent's safe.
Indeed, when a policy is delivered without requiring payment, the
presumption is that a credit was intended and the policy is valid.
*Miller* v. *Life Ins. Company*, 12 Wall. 303. From the evidence
then before the court, it satisfactorily appeared that Mr. Griffin
understood that he was expected to renew this policy, and from the

whole tenor of his evidence and especially from his letter acknowledging the receipt of the plaintiff's proof of loss, it was manifest that Mr. Griffin understood that the policy had been renewed and was in full force at the time of the accident.

It was not so distinctly and conclusively shown, however, by direct evidence, that Mr. Washburn intended to have it renewed or understood that it had been renewed. But this evidence is now supplied and all question upon that point removed by the testimony given in her deposition at this second hearing, by Miss Lord, who had been policy clerk and bookkeeper in Mr. Griffin's office for thirteen years. In answer to interrogatories she testified as follows upon this branch of the case:

Q. Were you acquainted with Mr. Henry Washburn in his lifetime?

A. Yes sir.

Q. Shortly before his death did Mr. Washburn call at Mr. Griffin's office?

A. Yes sir.

Q. Will you fix the time as nearly as you can?

A. I can't say whether it was a week or two weeks before, but it was a very short time before his death.

Q. Now will you state what was said and done by Mr. Washburn at that time, and what you yourself did in connection with his business?

A. I can't remember the exact words he said. Mr. Washburn came in and asked if Mr. Griffin was here and when told he was not said he had no special word to leave, except that he was going away on a short trip and for Mr. Griffin to look after his insurance matters, as he always had. He asked some question about some insurance, I don't just remember what, and I went to the safe and got all his insurance papers—they were bound together—gave them to him, and he took them and ran them over in his hand. I don't know how much time he spent on them—I can't tell. He handed them back and started to go out and came back and just repeated his injunction for Mr. Griffin to keep up his insurance, and remarked that he would do so anyway. That was all the conversation he had.

I think Mr. Washburn's own words were for John not to let anything expire, if I remember his own words. That was what he always said.

Q.   Whether or not this policy, No. X 12680, was handed by you to Mr. Washburn among the other policies?

A.   It was.

Q.   Whether or not at that time it had attached to it the renewal agreement A 29650, countersigned by Mr. Griffin?

A.   It had.

Q.   To make my question clear, whether or not the renewal agreement had been countersigned by Mr. Griffin before that time?

A.   Yes sir.

Q.   After Mr. Washburn had looked over his policies, as you have testified, what was done with them, including the policy and renewal about which we have been talking?

A.   He returned them to me and I put them back in the safe."

It is thus made clear that there was a correlative obligation between the insurer and the insured and the contract was legally renewed.

But it is further contended in behalf of the company that the warranties in the plaintiff's application for the policy and in the schedule of statements, that he was a "hotel keeper" and that he was "free from any intemperate habits" were not true.

It is proved beyond controversy, however, that Mr. Griffin himself, the defendant's general agent, wrote the application for the policy and under his general authority and implied request, signed Mr. Washburn's name to it, and answered the interrogatories respecting his occupation and habits in the absence of Mr. Washburn, and without any knowledge on his part of the nature of the answers. These facts are conclusive against the company's contention upon this point.

It is provided by section 93 of chapter 49, R. S., that "such agents (of foreign insurance companies) and the agents of all domestic companies, shall be regarded as in the place of the company in all respects regarding any insurance effected by them. The company is bound by their knowledge of the risk and of all matters connected therewith. Omissions and misdescriptions known

to the agent shall be regarded as known by the company and waived by it as if noted in the policy." In *Marston* v. *Life Ins. Co.*, 89 Maine, 266, it was held in the case of a life insurance policy, that where the application is drawn by the authorized agent of the company and the answers to the questions therein are written by the agent in filling the application, without fraud or collusion on the part of the applicant, the company is estopped from controverting the truth of such statements in an action on the policy. See also *Hilton* v. *Phoenix Assurance Co.*, 92 Maine, 272; *Hewey* v. *Insurance Co.*, 100 Maine, 523.

As stated in the opinion in the case last cited, "It is incumbent upon the company to show that the misrepresentations were his (the applicant's) and not mistakes or misrepresentations of its own. . . . Otherwise it would be in the power of the company or its agents in such a case to fraudulently destroy the legal status of the policy so obtained."

It is conceded, however, that the warranty in regard to the applicant's occupation was true at the date of the policy, and it satisfactorily appears that, although he ceased to be a hotel keeper before the renewal of the policy, his change of occupation in no respect increased the hazard. And whatever the truth may have been in regard to the use of intoxicating liquors by the insured, the evidence presented to the court is wholly insufficient to support the conclusion that he was a man of "intemperate habits" within the meaning of that term as used in policies of insurance and interpreted by the courts.

*Judgment for the plaintiff for $5000 with interest from May 21, 1908.*